UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | Criminal Action No. 5:15-100-DCR |
| V. | ) ) ) | |
| SERAFIN VILLA-GOMEZ, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Serafin Villa-Gomez's motion to suppress certain statements he made to police during a search of his home on November 17, 2015. [Record No. 37] The motion was referred to United States Magistrate Judge Robert E. Wier for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After conducting an evidentiary hearing,[1] Magistrate Judge Wier issued a Recommended Disposition on March 11, 2016, recommending that this Court deny the motion to suppress. [Record Nos. 48, 51] Thereafter, Villa-Gomez filed objections to the Recommended Disposition.[2] [Record No. 55] The United States then responded to the defendant's objections. [Record No. 56] Having reviewed the record along with the

---

[1] The magistrate judge also received testimony during the evidentiary hearing regarding Villa-Gomez's motion to compel the identity of a confidential informant [Record No. 38] and his motion to suppress the other fruits of the November 17, 2015 search [Record No. 36]. Magistrate Judge Wier denied Villa-Gomez's motion to compel by order dated March 11, 2016. [Record No. 52] On April 7, 2016, this Court adopted the magistrate judge's recommendation to deny Villa-Gomez' motion to suppress the search. [Record Nos. 50, 58]

[2] Because Villa-Gomez filed objections, the Court will conduct a *de novo* review. 28 U.S.C. § 636(b)(1).

Recommended Disposition, the Court agrees that Villa-Gomez's motion to suppress should be denied.

## I.

In his Recommended Disposition, the magistrate judge summarized the evidence presented at the evidentiary hearing. [Record No. 51] Villa-Gomez does not challenge the following excerpts from that summary:

> At the hearing, both sides had a full and fair opportunity to present witnesses bearing on the *Miranda* issues. The United States called Detective Matt Evans (of the Lexington Police "LPD"/DEA Task Force) and Detective Steven Cobb (of the Lexington Police). Defendant Villa-Gomez called his daughter, Alma Villa-Villaneuva, who was present along with Villa-Gomez and others at the scene of the November 17, 2015 warrant execution.
>
> Police suspected cocaine trafficking at 2317 Lonan Court and secured a warrant to search that residence on November 17, 2015. A group of 10-12 officers executed the warrant, led by Detective Matt Evans. Detective Steven Cobb operated the door ram to gain access (following an ignored knock and announce). Cobb is a Spanish translator, and he was present, in part, to offer translation services at the home.
>
> Evans described the house as occupied by multiple adults and children, to include Defendant, various other adults, and associated family members. . . . [Police] secured the house (a single-family 2 bedroom home), cuffed the adult males for safety reasons, and gathered all adults in one screened and secure area. Cobb communicated with the household in Spanish. (Evidently, only one resident, teenager Alma Villa-Villaneuva was adequately bilingual.) Evans read the warrant, and Cobb provided a summary in Spanish. Evans promptly asked, via Cobb, to speak to the "man of the house." Villa-Gomez stood up and, as directed, walked outside with Evans and Cobb to talk.
>
> Notably, the Lexington Division of Police certifies Cobb as qualified (in Spanish) to translate law-related encounters. He has gone through formal training and certification testing, each featuring lengthy immersion periods in Mexico, on two occasions (in 2001 and 2006). He remains classified as having this language specialty and is compensated as such by the department. Cobb regularly acts as a translator for LPD, and his language facility and certification partly justified Cobb's presence at the Lonan Court search on November 17. Cobb testified that the LPD relies on the accuracy of his translation services when used. Outside, Evans and Cobb intended to question

Villa-Gomez, who remained in handcuffs. They stood with Villa-Gomez on the small, concrete patio beside the house. Both Evans and Cobb testified that Cobb first read Villa-Gomez his *Miranda* rights. Cobb had a pre-printed card, written in Spanish, that he testified captured each of the required *Miranda* warnings. . . . Cobb testified that he read the card verbatim, and that he queried whether Villa-Gomez understood his rights. Per Cobb, Villa-Gomez answered in the affirmative and nodded. Detective Evans confirmed the recitation and said that Villa-Gomez "said he understood" and nodded. The sole testimony from the encounter is that of Cobb and Evans, who each describe Villa-Gomez as being informed of and affirmatively assenting, by word and action, to his understanding of the admonitions.

Villa-Gomez then participated in an interview, broken by a short interval (perhaps as long as 20 or as short as 3-5 minutes) when Detective Evans returned to the house to search. The first portion of the interview involved only questions about possible contraband and guns in the home. Evans related this as safety based and an opportunity for a suspect to assist immediately. At that point, authorities had found nothing. Cobb was basically a mouthpiece for the discussion, which Evans guided. Per Evans, Villa-Gomez denied any contraband but admitted there was a gun in his bedroom – he directed authorities to ask his wife for the exact location. The second encounter was after the search began yielding fruit (multiple cocaine kilos and significant cash). Evans recorded the second encounter and testified that he simply had forgotten to tape the first interview. . . .

Evans claimed that Cobb reconfirmed mid-interview that Villa-Gomez understood his rights, but Cobb was not sure that occurred. (Cobb also described only a very brief gap in time when Evans left to search.) The tape did not reveal a second reference to *Miranda* rights. The United States played the full tape at the hearing. Much of it was in Spanish, and the audio was of low clarity. . . . [At some point during the interview,] DEA Special Agent Jared Sullivan appeared and directly informed Villa-Gomez about the trouble he faced and the value of cooperation; SA Sullivan was dubious of the story Villa-Gomez told. . . .

Both officers described Villa-Gomez as having a cordial and cooperative demeanor throughout, though he became agitated or seemed downtrodden when Evans told him police had found cocaine and bulk cash. Cobb and Evans consistently testified that Villa-Gomez answered their questions, did not ever ask to stop questioning, and did not ask for counsel. Both said Villa-Gomez had no trouble communicating and was not hesitant. Both denied making any threat toward or otherwise intimidating Villa-Gomez. To the extent Cobb noted any difficulty in the interrogation, he said that centered on specific and unusual vocabulary (*e.g.*, the proper word for "cooler," where police found kilos of cocaine) or on trying to pin down Villa-Gomez's answers

>for the alleged source and destination for cash or drugs. That is, Cobb indicated minor trouble in communication regarding the facts related to the cocaine and money, not difficulty regarding language, overall interaction, and the expression of information regarding *Miranda* rights.
>
>Alma Villa-Villaneuva was the lone defense witness. She generally confirmed the scene described by Cobb and Evans. Villa-Villaneuva was not outside for the interview. She testified that, at one point, police returned Villa-Gomez to the secure couch area inside. She claimed Villa-Gomez told her he could not understand anything the police were saying to him. The defense suggests this undercuts whether Defendant knowingly and voluntarily waived his rights. (The witness had agreed that Villa-Gomez stood up as the 'man of the house' and walked outside with officers, as Cobb indicated.) . . . .
>
>Finally, the Court notes that the total interview time was only approximately 30 minutes (combining the initial 3-5 minutes with the later 20+ minute taped session). Covering this period, per Cobb, he and Villa-Gomez remained on the patio until the conclusion of the interview.

*Id.* at 2-5.

Based on the evidence presented at the hearing, the magistrate judge observed that Villa-Gomez was able to engage "in an extensive and conversational discussion" with Detective Cobb. [Record No. 51, p. 4] Magistrate Judge Wier also found that "Villa-Gomez obviously understood what Cobb was communicating to him. Thus, he responded to questions, told his version of events, and answered (and asked) questions." *Id.* Accordingly, the magistrate judge concluded that Villa-Gomez voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Id.* at 9. In his objections, Villa-Gomez counters that "his lack of English skills, his lack of familiarity with the American criminal justice system, his Mexican cultural background, and the detective's statements [regarding the potential for jail time] worked together to render [his] statements . . . involuntary." [Record No. 55, p. 1]

## II.

"Statements made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly, and intelligently.'"[3] *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Colorado v. Spring*, 479 U.S. 564, 566 (1987)).  The Court must consider the voluntariness issue "primarily from the perspective of the police."  *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009)  Thus, a defendant's waiver is voluntary if the "police had no reason to believe that [the defendant] misunderstood the warnings."  *Id.*

The United States Court of Appeals for the Sixth Circuit has acknowledged that language difficulties may affect the voluntariness of a defendant's waiver.  *Al-Cholan*, 610 F.3d at 954.  Thus, courts should consider any language barriers as a factor when weighing the validity of a waiver.  *United States v. Alaouie*, 940 F.2d 663 (table), 1991 WL 144479, at *4 (6th Cir. Aug. 1, 1991).  However, like the magistrate judge, the undersigned questions whether there was a language barrier at all.  Detective Cobb read the defendant his *Miranda* rights in his native language, and the interview was also conducted in Spanish.  *See United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) ("Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated."); *Garcia-Dorantes v. Warren*, 769 F. Supp. 2d 1092, 1108 (E.D. Mich. 2011) (same); *United States v. Vicente-Sapon*, No. 1:12-CR-106, 2012 WL 5507301, at *6 (E.D. Tenn. Nov. 14, 2012) ("While it is true that a language barrier is

---

[3] Neither party disputes that the interview qualified as a custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). [Record No. 51, p. 6 n.2]

relevant to determining a valid waiver, this determination is not difficult when a suspect is advised of his rights in a language he understands." (internal quotation marks and citation omitted)).

The only evidence that Villa-Gomez did not understand the *Miranda* warnings was Alma Villa-Villaneuva's testimony that Villa-Gomez told her that he could not understand the police. [Record No. 51, p. 5] However, Villa-Villaneuva was not present for any of Villa-Gomez's interview with police, nor was she present when Detective Cobb read Villa-Gomez his rights. As the magistrate judge aptly observed, Villa-Villaneuva's testimony was based on unverifiable hearsay. *Id.* Moreover, a statement made by Villa-Gomez outside of the police's hearing and outside of the context of their interview has no bearing on the question of whether police had reason to believe that Villa-Gomez did not understand. Because Villa-Gomez stepped forward when Detective Cobb asked for the man of the house and then conversed with Detective Cobb freely, the police had no reason to doubt that Villa-Gomez voluntarily waived his right to remain silent under *Miranda*.

According to Villa-Gomez, his Mexican cultural heritage prevented him from truly understanding his *Miranda* rights. For support, Villa-Gomez cites to two news articles that report that Mexico only recently (in 2008, to be implemented by 2016) amended its Constitution to include a presumption of innocence. [Record No. 55, p. 2] Because Villa-Gomez is from Mexico, he argues that his understanding of the right to remain silent is colored by Mexico's traditional presumption of guilt. *Id.* This argument ignores the rule that voluntariness must be considered from the police's, not the defendant's, perspective. The police cannot be expected to intuit the background and cultural context of every individual who they interview. If law enforcement have reason to know about the defendant's cultural

context, that factor could enter into a court's totality of the circumstances analysis. However, as discussed above, many other factors in this case indicate that Villa-Gomez did understand his rights and voluntarily waived those rights. Further, Villa-Gomez has not offered any evidence tending to show that his cultural context *actually* affected his ability to understand his rights. He merely asks the Court to infer that fact from two newspaper articles reporting on the Mexican legal system. After considering all the circumstances, the Court concludes that Villa-Gomez's Mexican heritage did not prevent him from voluntarily waiving his *Miranda* rights. *See Al-Yousif v. Trani*, 779 F.3d 1173 (10th Cir. 2015) (Applying the Antiterrorism and Effective Death Penalty Act's deferential standard of review, the Tenth Circuit upheld the state court's voluntariness finding where defendant produced an expert witness who testified that his poor English skills and Arab cultural context prevented him from understanding *Miranda* warnings.).

Finally, Villa-Gomez argues that his statements were rendered involuntary when Agent Sullivan told him "that he [would] go to prison for at least five years unless he [told] the detective more about the drugs and cash . . ." [Record No. 55, p. 3] According to Villa-Gomez, the agent's threat "contradict[ed] the assurance contained in the *Miranda* warnings that silence will carry no penalty."[4] *Id.* However, Agent Sullivan's attempt to focus Villa-

---

[4]   Villa-Gomez cites to *Wainwright v. Greenfield*, 474 U.S. 284, 290 (1986), for this quote. [Record No. 55, p. 3] However, *Greenfield* contains no such quotation and is distinguishable from this case. In *Greenfield*, after police read the defendant his *Miranda* warnings, he stated that he wished to consult a lawyer and thereafter maintained his silence. *Id.* at 286. At trial, the prosecutor used his request for a lawyer and subsequent silence to rebut the defendant's insanity claim. *Id.* at 287. In reviewing his petition for habeas corpus, the Supreme Court found that assuring a defendant that his "silence will carry no penalty" and then using his silence against him in trial is fundamentally unfair and violates due process. *Id.* at 295. Unlike Greenfield,

Gomez's attention on the potential legal consequences of his actions "is not self-evidently coercive; indeed it is more likely to focus the mind on the importance of answering questions accurately, voluntarily or not at all." *United States v. Phillips*, 230 F. App'x 520, 525 (6th Cir. 2007). *See McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006) ("We are not prepared to forbid police from conveying to suspects the seriousness of the crime for which they are being investigated."). In *Phillips*, the agent told the defendant, who was later charged with child pornography offenses, that the agents "were trying to decide how much of a monster [Phillips] was, whether or not [he] should spend 18 months in jail or whether [he] should spend the rest of [his] life in jail." *Id.* at 524. The Sixth Circuit characterized the agent's statements as "unnecessary and inappropriate" but found that they did not render the defendant's statements involuntary. *Id*. at 524-25.

Here, Agent Sullivan's statements to Villa-Gomez were significantly less inflammatory than in *Phillips*. In fact, the magistrate judge found that Agent Sullivan "was appropriately frank and stern but not improperly intimidating or coercive." [Record No. 51, p. 4] Like the facts presented in *Phillips*, none of the law enforcement agents involved in this case implied that Villa-Gomez was physically at risk. Instead, they informed him of the natural consequences of the crimes that they suspected he committed. Such warnings did not invalidate Villa-Gomez's waiver of his *Miranda* rights. Thus, the magistrate judge correctly concluded that his motion to suppress his statements should be denied.

---

Villa-Gomez chose not to remain silent, and the Court is not faced with a situation where Villa-Gomez's silence was used against him at trial.

**III.**

Having conducted a *de novo* review of the issues raised by Villa-Gomez in his objections [Record No. 55] to Magistrate Judge Wier's Recommended Disposition [Record No. 51], it is hereby

**ORDERED** that:

1. The Recommended Disposition of Magistrate Judge Robert E. Wier [Record No. 51] is **ADOPTED** and **INCORPORATED** by reference;

2. Defendant Serafin Villa-Gomez's objections to the Magistrate Judge's Recommended Disposition [Record No. 55] are **OVERRULED**; and

3. Defendant Serafin Villa-Gomez's motion to suppress [Record No. 37] is **DENIED**.

This 8th day of April, 2016.

Signed By:
*Danny C. Reeves*  DCR
United States District Judge